# Attachment C

# Plaintiff's Outline of the Case

This case arises under provision of the Federal Railroad Safety Act ("FRSA") that prohibit railroads from retaliating against employees who notify railroads of safety conditions or refuse to work under unsafe conditions. It involves a series of retaliatory harassment incidents by Defendant Norfolk Southern Railway Company.

The first incident occurred in June 2019, when the air hose on a Norfolk Southern train failed, which put the train into emergency braking and brought it to a stop. It was in the early morning hours before the sun comes up. It was dark outside.

The train's conductor, climbed down from the engine to walk the train and try and locate the defective equipment and, if possible, repair it. She walked back until she came to a part of the track where the train was stretched out over a bridge, also known as a railroad trestle. The trestle was not particularly long, but it was high in the air, with pavement below. The edges of the trestle had no guardrail or handrail, and the auto-rack railcar stretched across it offered nothing for the conductor to hold onto. With the railcar on the tracks, there was only a narrow shoulder which was not wide enough to cross safely, particularly in the dark. Later, an inspector with the Federal Railroad Administration determined the walking conditions in this area were unsafe and reported it to Norfolk Southern's management.

On this very early June morning, the counductor, confronted with the hazardous trestle, turned around, went back to the locomotive and informed Norfolk Southern of the unsafe walking conditions and informed them that she would not be able to walk the train on account of the unsafe walking conditions. A rail car mechanic was dispatched in a pickup truck. He was able to drive his truck to the location on the train that contained the defective air hose and replace it.

When the train went into emergency, a railroad supervisor was called at home, where he was sleeping, and notified. The supervisor was upset because the stopped train was delaying other railroad traffic. He drove to the location of the stopped train. Because he was in an automobile, he was able to drive to the location of the defect.

As dawn was breaking and with the area now visible, the condcutor was able to pick her way down a slope and walk around the trestle to where the defect was. She got there as the mechanic was replacing the bad air hose.

The supervisor was also there. He asked the conductor why she was not able to reach the location sooner. She reported the unsafe walking conditions and the lack of safe walking space on the bridge and explained that was the reason she was not able to reach the car until daylight.

Once the train was repaired, the train continued on to Atlanta. However, once the train reached the yard, the conudctor and the engineer were instructed to report to the yard tower. Although they had just finished working a full shift, including the delay related to the air hose failure, the conductor and engineer were separated into different rooms and asked to write statements about what happened.

In retaliation for Plaintiff reporting the unsafe working conditions and refusing to risk her safety, the supervisor who had to get out of bed and travel to the scene took the conductor out of service and brought disciplinary charges against the her for not walking over the bridge.

Under the rules that apply to railroad discipline, the conductor had a right to be present at the hearing for the discipline charges. Despite these rules, the supervisor and another railroad supervisor held the hearing when the conductor was not present and assessed her with a disciplinary violation for not refusing to walk over the bridge even though doing so would have been unsafe.

The conductor was named Victoria Crump. She filed a complaint under a law that prohibits railroads from retaliating against workers who notify the railroad of hazardous safety conditions or refuse to work when confronted with hazardous safety conditions.

Unfortunately, after this first incident, Defendant Norfolk Southern continued to retaliate against Ms. Crump.

The second incident occurred on January 11, 2021. Ms. Crump was the conductor of a train traveling from Chattanooga, Tennessee to Atlanta, Georgia.

On said date, workers in Tennessee put the train together, and when Ms. Crump assumed control of the train, she realized that it had been put together in

such a way that when she dropped off cars along the route, the train would have a light car in the first ten cars, which was prohibited by Norfolk Southern's rules.

Having spotted this problem, Ms. Crump notified the Chattanooga Yardmaster and asked for permission to fix the order of the cars before leaving Chattanooga. The Yardmaster directed Ms. Crump to take the train as it was.

Partway through the trip, Ms. Crump tried to contact a supervisor to get permission to fix the cars in Rome, Georgia. No supervisor was available, but the dispatcher told her to bring the train into Atlanta with light cars in the first ten cars. Ms. Crump did as she was instructed.

When Ms. Crump got to Atlanta, Ms. Crump turned over the train to a new crew, which also continued to run the train with a light car towards the front of the train. Although Ms. Crump had reported the problem and made multiple attempts to fix it, Norfolk Southern disciplined her for having a light car towards the front of the train. No one else was targeted for discipline related to the situation. Norfolk Southern singled out and targeted Ms. Crump, who was the conductor that reported the problem and did nothing but follow the instructions given to her by two different Norfolk Southern employees. Norfolk Southern did not take any steps to discipline those who had created the problem, nor those who had instructed Ms. Crump to take the train to Atlanta without fixing the car placement .

After this incident occurred, the rule about light car placement was discontinued. During the time it was in effect, Norfolk Southern only disciplined one other person for violating it besides the Plaintiff. That employee was given a "minor" infraction, but Norfolk Southern assessed Ms. Crump a "serious" penalty, despite her doing her job as ordered.

The final incident occurred in June 2021, when Ms. Crump was again taking a train from Chattanooga to Atlanta. Other workers were supposed to build the train and provide proper paperwork and brake slips for the train's safe operation. However, this was not timely done, resulting in the train being delayed. Ms. Crump emailed her supervisors, including James NeeSmith, to alert them to the problem.

Eventually, the train left Chattanooga. Because of the delay, it was not able to make it to Atlanta before Ms. Crump and her engineer exceeded the hours-of-service regulations, meaning Ms. Crump and her engineer would need to "swap out" with another crew along the way. A hired minivan containing the new crew

was dispatched to meet them along the way, and then drove Ms. Crump and her engineer back to their home terminal.

The dispatcher instructed the crew to swap out at a location known as "Rogers." Rogers was not a normal place where they would swap their crews. Norfolk Southern's own listing of signal locations indicate that Rogers is "not accessible by road." Ms. Crump asked to do the swap at another location that could be safely accessed by road, but that request was refused.

The "road" that leads to Rogers is steep, covered with gravel, has ruts and washed-out areas. On the way out, the van got stuck and Ms. Crump and her engineer had to get out of the van while the driver attempted to get the vehicle unstuck. Ms. Crump reported the dangerous pick-up and van ride to Norfolk Southern.

In response to Ms. Crump's reporting of safety hazards on that tril, the supervisor named NeeSmith began looking for a way to punish her. This involved a series of fishing expeditions, looking for something to discipline Ms. Crump for. First, NeeSmith claims he was concerned Ms. Crump had sent the email notifying him of the problems in Chattanooga from an "unapproved phone." He checked with another department in the railroad and quickly found out this was not the case.

Next, he claims he was concerned that she sent the email from an "unapproved location." Again, he found out this was not the case. Having been unable to fine any rule violations by Ms. Crump, he finally, he arranged to look at internal surveillance camera footage from inside the locomotive Ms. Crump was working on that day. NeeSmith admits he has never done this with respect to any other employee, ever.

NeeSmith and his boss watched two hours of surveillance video of Ms. Crump working that day. NeeSmith then charged Ms. Crump with sleeping on the job and not calling signals, which he claimed to have discovered by watching the video. At the discipline hearing, NeeSmith reiterated his claims - that the video showed Ms. Crump not calling signals, which was part of her job. However, when the video was reviewed, it turns out NeeSmith had lied. The only signals Ms. Crump did not call were those belonging to CSX, a different railroad. She was not required to call CSX signals. The video shows her performing her job.

With respect to the sleeping charge, NeeSmith claimed that the video showed her slumped. However, the video shows her doing all required elements of her job.

Her engineer on the trip wanted to come testify on Ms. Crump's behalf that she was doing her job and was not sleeping. NeeSmith did not allow him to come testify at the discipline hearing. And indeed, even though the charges were false, Norfolk Southern again disciplined Ms. Crump.

Taken together, the facts show that Ms. Crump reported hazardous safety conditions, refused to work when confronted with unsafe conditions and filed a complaint with OSHA when Norfolk Southern violated the FRSA. In response, Norfolk Southern and NeeSmith retaliated against Ms. Crump by looking for ways to discipline her, subjecting her to extra scrutiny, charging her with false disciplinary allegations and treating her differently than other employees.

As a result of the retaliatory actions taken by the Defendant against her, Ms. Crump suffered injuries in the form of emotional and mental pain and suffering. She incurred lost wages for the time she was held out of service. She suffered humiliation and embarrassment and stress and anxiety.

This case is brought under the protections afforded by workers like Ms. Crump and seeks to place her back in the same position she would be in had Norfolk Southern not violated the law by retaliating against Ms. Crump for her efforts to ensure her safety and make Norfolk Southern a safe railroad.